UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBERT G. DAILEY III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-00233-RLY-TAB |
| | ) | |
| TOM FRANCUM, SGT. MASON, SUPT. FINNAN, and DONNA CARNAGE, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' AFFIRMATIVE DEFENSE**

**I.     Background**

Plaintiff, Robert G. Dailey III, brought this civil rights action *pro se* pursuant to 42 U.S.C. § 1983, against defendant prison officials, Tom Francum, David Mason, Alan Finnan, and Donna Carneygee.  While a prisoner at the Pendleton Correctional Facility ("Pendleton"), Mr. Dailey sustained serious injuries when another prisoner stabbed him with a homemade weapon.  Mr. Dailey alleges Defendants violated his Eighth and Fourteenth Amendment rights when they denied his repeated requests for protective custody made in response to threats by gang members.

Defendants asserted the affirmative defense that Mr. Dailey failed to comply with the exhaustion requirement set forth in the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  The court held an evidentiary *Pavey* hearing on February 11, 2015, to determine whether, prior to filing this lawsuit, Mr. Dailey exhausted his administrative

1

remedies as prescribed by the Indiana Department of Corrections ("IDOC"). *See Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). Mr. Dailey attended the hearing in person and by counsel. Defendants were present by counsel. In addition to documentary evidence, the court heard testimony from Mr. Dailey and prison staff, Wayne Scaife and Danny Fountain.

The Defendants bear the burden of proof as to this defense. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). For reasons set forth below, the court finds that Defendants did not meet their burden of showing that Mr. Dailey failed to exhaust his administrative remedies.

## II. Discussion

### A. Legal Standards

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust his available administrative remedies before filing a lawsuit concerning prison conditions. 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Cottman v. Richardson*, 1:13-cv-01793-JMS-DML, 2014 WL 3846051, at *1 (S.D. Ind. Aug. 5, 2014) (quoting *Porter v. Nussle*, 534 U.S. 516, 524–25, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)). To exhaust available remedies, the prisoner must adhere fully to the prescribed steps until the administrative authority cannot take any further action. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Id.* Although exhaustion must occur before the prisoner files the lawsuit, *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004), the prisoner need only exhaust those remedies available to him. § 1997e(a); *Dole*, 438 F.3d at 809. If prison staff fail to respond to a properly filed grievance or take affirmative steps to obstruct the grievance process, that remedy becomes unavailable to the prisoner. *Id.*; *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006) ("[W]hen prison officials prevent inmates from using the administrative process . . . , the process that exists on paper becomes unavailable in reality.").

### B.   Findings of Fact

Having considered the evidence presented at the hearing, the court makes the following findings of fact:

#### 1.   The Grievance Process

The IDOC's administrative Grievance Policy consists of three mandatory steps set forth in the Offender Grievance Process, effective as of January 1, 2010. (*See* Ind. Dep't of Corr. Manual of Policies and Procedures No. 00-02-301 ("Grievance Policy"), at 14–26). First, the prisoner must attempt to resolve the issue informally with either the staff person responsible for the situation or the person in charge of the area where the situation occurred. (*Id.* at 14). Second, if the prisoner finds no informal resolution, he may submit a formal grievance form to the executive assistant. (*Id.* at 16). The executive assistant must, within seven days, provide the prisoner a receipt of submission unless the grievance form is deemed unacceptable. (*Id.* at 17). A rejected grievance form must be

returned to the prisoner with an explanation of how to remedy any deficiencies. (*Id.* at 19). If the prisoner does not receive either a receipt or a rejected form within seven days, the prisoner must notify the executive assistant of that fact. (*Id.* at 17). Third, if the response from the executive assistant does not satisfy the prisoner, he may formally appeal the response to the Department Offender Grievance Manager, whose decision constitutes the final administrative disposition. (*Id.* at 23, 26). Notably, nowhere in the written Grievance Policy does it warn that failure to adhere to the procedures set forth therein will preclude a civil rights lawsuit.

  Wayne Scaife, the executive assistant at Pendleton, is responsible for receiving, processing, and investigating all prisoner grievances at that facility.[1] When Mr. Scaife receives a grievance form, he date stamps it and makes a facial determination of whether the prisoner properly completed the form. For example, Mr. Scaife rejects and returns any grievance form that contains missing information, such as a description of the prisoner's informal attempts to resolve the issue. In such a case, the grieving prisoner receives the rejected grievance form and an accompanying "return of grievance" form that explains how the prisoner can remedy the deficiencies. If, and only if, Mr. Scaife finds the grievance form acceptable, he logs it into the offender grievance reevaluation system ("OGRE"). After an investigation into the substance of the grievance, Mr. Scaife then provides the prisoner a written response, or decision, on the relief sought.

---

[1]   Mr. Scaife testified that his official job title is "grievance specialist," although he initially referred to his position as "community services director," "grievance specialist," and "executive assistant." Because he processes the grievances at Pendleton, the court will refer to him as an "executive assistant" consistent with the Grievance Policy.

4

The Grievance Policy requires that all prisoners receive instruction on the grievance process during orientation to the IDOC and its facilities.  (*See* Grievance Policy at 2).  Danny Fountain, a caseworker at Pendleton, conducted prisoner orientations.  Mr. Fountain relied on a "check sheet" of topics to guide the orientation and ensure that newly incarcerated inmates received the necessary information on day-to-day living at the facility.  He checks off topics as he covers them, prints the prisoner's name and date of the orientation, and has the prisoner sign the sheet at the conclusion of orientation.  For prisoners who transfer to Pendleton from other IDOC facilities, where they receive similar information, Mr. Fountain abridges his orientation, sparing the details unless the prisoners request otherwise.  Notwithstanding the degree of detail in Mr. Fountain's presentation, he routinely informs all prisoners of where they can find grievance forms and to whom they should address related questions.

### 2. Availability of the Grievance Process to Mr. Dailey

Mr. Dailey first learned about IDOC's grievance procedures some time in 2008 while a prisoner at the Branchville Correctional Facility.  He arrived at Pendleton on September 22, 2010.  The court heard conflicting testimony as to whether Mr. Dailey received an orientation upon his arrival to Pendleton.  Defendants presented an orientation check sheet containing both Mr. Fountain's and Mr. Dailey's signatures and a mark next to the topic labeled "Appeals/Grievances," indicating that Mr. Fountain addressed that topic with Mr. Dailey.  Mr. Fountain testified that he would have given Mr. Dailey an abbreviated version of orientation—with no discussion of the appeals process—because he transferred from another IDOC facility.  The check sheet, however,

5

states that Mr. Dailey and Mr. Fountain completed the orientation on August 24, 2010, approximately one month before Mr. Dailey transferred to Pendleton.

Although Mr. Dailey concedes that his signature appears on the check sheet, he testified that he never received orientation from Mr. Fountain and that he had never before seen—much less signed—the check sheet. According to Mr. Dailey, the extent of any orientation he received occurred in early October 2010 and consisted of a staff person arriving at Mr. Dailey's cell and handing him two envelopes and paperwork to sign. Mr. Dailey testified that no one at Pendleton explained to him step-by-step how to properly file a grievance or an appeal. He insists that he had not received such an explanation since his orientation at the Branchville facility in 2008, where he would have learned about the pre-2010 grievance process.

Records show that Mr. Dailey properly filed two formal grievances prior to the grievance giving rise to this lawsuit. His first grievance dates back to September 2008 and concerned dental care; the second grievance was filed on February 10, 2011, and concerned Mr. Dailey's commissary account. Both grievances concluded at the first step of the process, meaning the executive assistant accepted the grievances, logged them into OGRE, and delivered a response concerning the relief sought. In neither case did Mr. Dailey appeal the decision of the executive assistant.

On August 22, 2010, while a prisoner at IDOC's Correctional Industrial Facility ("CIF"), Mr. Dailey filed a third grievance form concerning stolen property. In the body of the form, he articulated in detail the circumstances of his grievance and the steps taken to resolve the issue, including dates and names of individuals. Mr. Dailey did not,

however, record the same information in the bottom portion of the form where the prisoner must describe the steps taken to resolve the issue informally. Consequently, the executive assistant returned the grievance form to Mr. Dailey and attached to it a separate "return of grievance" form specifying this deficiency.

### 3. The April 7th Grievance

On March 28, 2011, prison staff handcuffed and escorted Mr. Dailey down the range. As they walked by the cell of inmate Troy Riggs, Riggs reached through the unlocked cuff port and stabbed Mr. Dailey with a homemade weapon. As a result of his injuries, Mr. Dailey underwent surgery at Wishard Hospital in Indianapolis.

The testimony muddled the timeline of events, but upon his return to Pendleton, Mr. Dailey initially spent some time in the infirmary before being transferred to protective custody. On April 7, 2011, Internal Affairs Officer Tom Francum and an Indiana State Police detective interviewed Mr. Dailey regarding the attack. That same day, Mr. Dailey obtained a grievance form from Counselor Mike Kidder. The parties dispute whether Mr. Dailey ever properly filed this grievance. Mr. Dailey insists that his cell neighbor, whose handwriting was more legible, filled the form out on his behalf and Mr. Dailey then placed the form in "offender mail."[2] Mr. Dailey testified that roughly two weeks later, Mr. Scaife and Counselor Kidder approached Mr. Dailey at his cell where Mr. Scaife informed him that he could not process the grievance due to the

---

[2] The testimony confirms that receptacles designated for grievance forms exist throughout the facility. In this instance, Mr. Dailey testified that he mailed the form directly to Counselor Kidder, meaning he placed the form on the ledge of his cell for prison staff to collect for mail circulation.

ongoing investigation of the attack by the Indiana State Police and Internal Affairs. Mr. Dailey contends that Mr. Scaife did not mention the appeals process or suggest any other recourse. He understood Mr. Scaife's comments to mean that he could not process the grievance *until* the investigation concluded.

Mr. Scaife denies the legitimacy of Mr. Dailey's purported grievance form. He notes the absence of a date stamp, Mr. Dailey's signature, and housing assignment. Based on these deficiencies, Scaife claims he would have returned the form to Mr. Dailey with an appropriately marked "return of grievance" form. Scaife also testified that he does not recall a conversation with Mr. Dailey, although he conceded that such a conversation would not be unusual if an Internal Affairs investigation had overlapped with a grievance. Defendants did not dispute whether Internal Affairs had an ongoing investigation while Mr. Dailey was in protective custody. Mr. Scaife even testified that when he receives a grievance concerning an issue under investigation by Internal Affairs, he explains to the prisoner that he cannot resolve the issue or offer relief. Mr. Scaife clarified, however, that in such cases, he nonetheless would log the grievance in OGRE, which generates a printed response, and inform the prisoner of his right to appeal the response. Mr. Dailey denies that Mr. Scaife informed him of the option to appeal, contending that he took Mr. Scaife at his word that nothing could be done until Internal Affairs and the Indiana State Police completed the investigation. Furthermore, Defendants did not controvert Mr. Dailey's testimony that he did not have access to a written copy of the grievance process while in protective custody.

### C.  Analysis

As to whether Mr. Dailey received adequate instruction on the grievance process, the court credits Mr. Dailey's testimony. Mr. Dailey testified that he had not received an orientation of the grievance process since arriving at the Branchville facility in 2008, before the current Policy took effect. He insisted that he never had a meeting or anything resembling an orientation with Mr. Fountain, who testified to the contrary. As evidence that such a meeting took place, Defendants presented a signed orientation document with a suspiciously inaccurate date. Yet even if the court credits the document's authenticity, Mr. Fountain conceded that he would have glossed over the details of the grievance process because Mr. Dailey transferred from another IDOC facility. Although he could not remember this purported conversation with Mr. Dailey, Mr. Fountain stated that he would have explained where to obtain and submit grievance forms. He testified that he would not have discussed the appeals process during orientation even though the topic category on the check sheet is "Appeals/Grievances." Compounding the problem, Mr. Dailey's uncontradicted testimony shows that while in protective custody, he did not have ready access to written copies of the grievance procedure.

Defendants seem to rely on the testimony of Messrs. Fountain and Scaife that it is common knowledge at Pendleton that case workers, among others, have all the forms necessary to commence a grievance or an appeal and can answer any questions regarding the process. In essence, Defendants maintain that the availability of staff to answer questions cures any deficiencies in the delivery of instruction or the accessibility of written procedures. Without a medium through which prisoners may access the step-by-

9

step procedure in plain language, the viability of potential claims rests on the precarious chances that a grieving prisoner directs the right questions to the right staff person who will then reliably convey the particulars of the process. The law requires strict compliance with the procedures set forth at the administrative level, including timeliness. *See Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (citation omitted). The evidence confirms that prison officials, too, enforce strict compliance with the procedures.[3] Officials, therefore, must ensure that prisoners have the necessary resources to avail themselves of the process.

This requires more than "open door" policies that presume prisoners know what questions to ask. Mr. Dailey's testimony confirms as much. When asked how he knew to file a grievance after the attack, he recited the perfunctory mantra in the prison: "If you have a problem, file a grievance." This does not adequately describe a policy—detailed in roughly twelve pages of text (*see* Grievance Policy at 14–26)—that imposes rigid timelines and substantive requirements upon the griever. *See King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015) (noting that prisoners cannot be required to satisfy procedures unknown to them, such as unwritten rules or unspoken understandings within the prison). Although the policy had existed for months prior to Mr. Dailey's arrival at Pendleton,

---

[3] For example, Mr. Dailey's August 22, 2010 grievance from CIF appears to detail his informal attempts to seek help from Internal Affairs concerning his stolen property. Yet, the executive assistant at CIF, James Dick, returned the form to Mr. Dailey for lack of an "apparent informal." Mr. Dailey ostensibly received this response because he detailed this information in the wrong space on the form. His frustration with the process is apparent, as he also writes, "I'm trying to do what I'm supposed to do and [Internal Affairs] will not respond."

Defendants provide no credible evidence that the current grievance process was fully available to Mr. Dailey either prior to or immediately following the attack.

The court cannot resolve from the evidence whether (1) Mr. Dailey in fact submitted a grievance form and, if so, whether (2) Mr. Scaife's conduct misled Mr. Dailey into believing the Internal Affairs investigation stalled the processing of his grievance. The court credits the testimony of Messrs. Dailey and Scaife. Mr. Scaife testified that Mr. Dailey's complaint—that Defendants failed to protect him from attack—is indeed a grievable issue. The evidence establishes that Mr. Dailey believed he had a grievable issue and that he at least knew he had to submit a grievance form, which causes the court to doubt that Mr. Dailey would simply fail to take this step. Moreover, his account of an encounter with Mr. Scaife and Counselor Kidder contains certain compelling details that align with Mr. Scaife's testimony. For instance, Mr. Scaife conceded that an Internal Affairs investigation would preclude him from granting relief for a grievance concerning the same incident. He also acknowledged that it would not be unusual to visit a prisoner's cell to discuss such a situation. He insisted, however, he would not refuse to process such a grievance, thereby precluding the prisoner's ability to appeal.

Because the court finds that the IDOC's administrative remedies were not made sufficiently available to Mr. Dailey, the court need not resolve the contradictory evidence concerning the validity of the April 7 grievance form.

**III.  Conclusion**

For the foregoing reasons, the court **rejects** Defendants' affirmative defense of failure to exhaust.  The case will proceed to pre-trial discovery.

**SO ORDERED** this 24th day of June 2015.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.